[Cite as *State v. Lucas*, 2025-Ohio-845.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 23AP-400 |
| v. | : | (C.P.C. No. 23CR-1037) |
| Kyle P. Lucas, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |
| | : | |

D E C I S I O N

Rendered on March 13, 2025

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Paula M. Sawyers* for appellee.

**On brief:** *Brian J. Rigg* for appellant.

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Defendant-appellant, Kyle P. Lucas, appeals from the judgment of the Franklin County Court of Common Pleas entered after a bench trial. The trial court found him guilty of felonious assault, in violation of R.C. 2903.11, and having a weapon while under disability, in violation of R.C. 2941.149(A). Mr. Lucas asserts that he is entitled to a new trial because his jury waiver did not strictly comply with R.C. 2945.05, and the state concedes this error. However, his assertion that the state's evidence was legally insufficient to support the felonious assault conviction is without merit. Accordingly, we reverse and remand for a new trial.

## I. Factual and Procedural Background

{¶ 2} On March 2, 2023, the state filed a two-count indictment against Mr. Lucas. Count one charged him with felonious assault, alleging that he had knowingly caused or attempted to cause physical harm to the victim, G.W., with a firearm on or about October 13, 2022. Because the offense "involved an attempt to cause or a threat to cause serious physical harm to a person, or resulted in serious physical harm to a person," it qualified as a second-degree felony under R.C. 2903.11. (Mar. 2, 2023 Indictment.) A firearm specification under R.C. 2941.145(A) and a repeat violent offender specification under R.C. 2941.149(A) accompanied the felonious assault charge. The second count alleged that Mr. Lucas had violated R.C. 2923.13, which prohibits having weapons while under disability, because he possessed a firearm after being convicted of possession of cocaine under R.C. 2925.11.

{¶ 3} On June 7, 2023, the court acknowledged that Mr. Lucas had "signed a jury waiver," and proceeded to a bench trial. (June 7, 2023 Tr. at 5.) The state's first witness was G.W., the victim. He testified that his daughter dated Mr. Lucas for approximately six months. *Id.* at 13. G.W. lived with his daughter, wife, and father-in-law at the time his daughter was dating Mr. Lucas. *Id.* Mr. Lucas did not live with them, but came over "pretty much every day." *Id.* G.W. "didn't approve" of the relationship between Mr. Lucas and his daughter, citing their age difference, "the violence, [and] the drugs being sold out of [his] home" as reasons. *Id.* at 14. G.W. testified that when he told Mr. Lucas that he didn't want him in his home anymore, "he pretty much told me it wasn't my decision." *Id.*

{¶ 4} On October 13, 2022, G.W.'s wife was out buying ingredients for dinner when his brother called him. *Id.* at 14-15. He walked upstairs while talking on the phone to his brother and saw Mr. Lucas, who apparently mistook a comment G.W. made to his brother as intended for him. Mr. Lucas said: "What the fuck did you say to me?" *Id.* at 15-16. G.W. went into his room and heard Mr. Lucas say: "I'm going to smoke every fucking body in this house." *Id.* at 17. G.W's daughter responded: "don't do that." *Id.* at 18. At that point, G.W. went into the other room and called 911 while his phone was recording. *Id.*

{¶ 5} G.W. admitted that there was a gun in the house, which he said was not his, although he had been charged previously with domestic violence and wasn't supposed to have one. *Id.* at 19. He placed it under the pillow of his bed after hearing Mr. Lucas's threats. *Id.* at 56-57.

{¶ 6}   G.W. changed the audio recording on his phone to a video recording because he felt like he had been blamed for everything when police had come to the house in the past. *Id.* at 21. According to G.W., Mr. Lucas "ha[d] been so manipulative," he wanted his wife and the police "to know what was actually going on." *Id.* at 21.

{¶ 7}   After hearing "a gun clicking" and the sound of "a bullet in the chamber," Mr. Lucas burst through the door of G.W.'s room with loaded a gun. *Id.* at 18-19. G.W. testified that Mr. Lucas said:

> No one here to save your bitch ass now, referring to my wife. And I said, What you are talking about? He said, Don't walk around me with an attitude. And I said, First of all, this is my house, and second of all, I didn't say anything to you. Referring to me walking up the stairs and I am hanging up the phone with my brother. He said, Shut up and get on the ground pussy. And he hits me in the head with the gun and he said, Get on the ground pussy. You know, I'm sitting there yelling, you know, and after he tells me to get on the ground, he hits me again in my eye a couple times and, you know, he gets up and walks out in the hallway and he tells my daughter and he said, I'm out of this bitch, and he turns around and lifted his arm up again. . . . By that time I am already full of blood, I cleared my face and I shot in self defense.

*Id.* at 21-22.

{¶ 8}   G.W. testified that Mr. Lucas hit him two times across the head and twice in his eye, resulting in visible scars. *Id.* at 23. G.W. felt like Mr. Lucas "was about to kill" him: "He already beat me with the weapon and [was] standing in the hallway," when "he aimed at me, that is when I started shooting." *Id.* at 24. G.W. chased Mr. Lucas down the hall, and fired at him again as he ran downstairs. *Id.* at 25. Mr. Lucas went outside, but G.W. was not sure where he went. *Id.* He went outside to look for him before coming back in the house. *Id.*

{¶ 9}   At this point, the police arrived. *Id.* G.W. went outside with his hands up and dropped his phone in the yard, which was still recording. *Id.* at 24-25. The police arrested him. *Id.* at 26. After he told them his phone had recorded the incident, they returned to his house to retrieve it. *Id.* at 26. G.W. identified the video, which was played for the court. (State's Ex. A.)

{¶ 10} After being questioned by the police, G.W. "refused" to go to the hospital because he had "a fear of needles" and he "didn't feel safe" going anywhere. (Tr. at 32.) Instead, he was treated by ambulance personnel. *Id.* He identified several photographs of his injuries and testified that he had gone to a hospital in Houston for treatment because he was "having problems with vision" as a result of the injury to his eye. *Id.* at 33-35. G.W. also testified that Mr. Lucas had continued to threaten him after the incident. *Id.* at 63.

{¶ 11} The state also called G.W. Wharton,[1] a prosecutor from the Franklin County Prosecutor's Office, who had been involved in two previous trials involving Mr. Lucas. *Id.* at 66. He identified a judgment entry from 2019 in which Mr. Lucas was convicted of possession of cocaine and having a weapon while under disability. *Id.* at 68-69. Mr. Wharton also identified a 2011 case in which Mr. Lucas entered a guilty plea to a charge of robbery, as well as a 2012 case in which Mr. Lucas was convicted of assault. *Id.* at 69. Certified copies of judgment entries from those cases were entered into the record. (State's Exs. U, V, & W.)

{¶ 12} The state's final witness was Jason Gunther, a detective at the Columbus Police Department. *Id.* at 70. He received the emergency call about the shooting at G.W.'s house and went to the hospital to interview Mr. Lucas, who had been admitted after G.W. shot him. *Id.* at 71-72. When Detective Gunther questioned Mr. Lucas, he said he didn't know who shot him and that if they found the shooter, he did not want him prosecuted. *Id.* at 73. Mr. Lucas was then taken into surgery. *Id.*

{¶ 13} Detective Gunther also questioned G.W., who had admitted to shooting Mr. Lucas. *Id.* at 74. He took pictures of the call records from G.W.'s phone, which corroborated his account of the night's events. *Id.* at 75. He also reviewed the video G.W. had recorded. *Id.* at 76.

{¶ 14} The next day, Detective Gunther went back to the hospital to interview Mr. Lucas. *Id.* He was unable to, however, because Mr. Lucas had checked himself out and had "left with a tube still down his throat." *Id.* at 77.

{¶ 15} Later, in another investigation involving Mr. Lucas, Detective Gunther found a notebook that contained "a lot of different . . . names and addresses" of persons with G.W.'s last name, including his wife. *Id.* at 78-79. G.W.'s daughter had told Detective

---

[1] Mr. Wharton has no relation to the victim, G.W.

Gunther that if Mr. Lucas "couldn't get to [G.W.], he was going to hurt somebody that meant something to" him. *Id.* at 79. The detective showed the entries in the notebook to G.W., who "confirmed that they were relatives of his." *Id.* at 80.

{¶ 16} The court found Mr. Lucas guilty of felonious assault with the charged specifications, and guilty of having a weapon while under disability. *Id.* at 98-99. The total aggregate sentence imposed was an indefinite term of 14 to 18 years. (June 9, 2023 Jgmt. Entry.) Mr. Lucas appealed and asserts the following assignments of error:

> [I.] The trial judge lacked authority to conduct a bench trial and find the defendant guilty of felonious assault in absence of a signed jury waiver in strict compliance with R.C. 2945.05.
>
> [II.] The trial court erred by limiting defense counsel's cross examination of the state's witness.
>
> [III.] The trial court erred when it allowed the state to present improper testimony regarding Mr. Lucas' prior conduct during a previous trial, in violation of F. R. E. 404(b).
>
> [IV.] The trial court erred when it denied Kyle Lucas' Rule 29 Motion for Acquittal.

## A. First Assignment of Error

{¶ 17} In the first assignment of error, Mr. Lucas argues that the trial court erred by failing to strictly comply with the jury waiver requirements under R.C. 2945.05 before conducting the bench trial. The state "agrees" and states that this "case must be reversed and remanded on this issue for a new trial." (Brief of Appellee at 4.)

{¶ 18} "The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, guarantees an accused the right to trial by jury." *State v. Lomax*, 2007-Ohio-4277, ¶ 6, citing *Duncan v. Louisiana*, 391 U.S. 145 (1968). *See also* Ohio Const., art. I, § 5 (stating that "[t]he right of trial by jury shall be inviolate"). Nevertheless, under Crim.R. 23(A), defendant "may knowingly, intelligently and voluntarily waive in writing his right to trial by jury." R.C. 2945.05, which governs the process for jury waiver in criminal cases, states:

> In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury. Such waiver by a defendant, shall be in writing, signed by the defendant, and filed in said cause and made a part

of the record thereof. It shall be entitled in the court and cause, and in substance as follows: "I _____, defendant in the above cause, hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a Judge of the Court in which the said cause may be pending. I fully understand that under the laws of this state, I have a constitutional right to a trial by jury."

Such waiver of trial by jury must be made in open court after the defendant has been arraigned and has had opportunity to consult with counsel. Such waiver may be withdrawn by the defendant at any time before the commencement of the trial.

{¶ 19} A jury waiver under R.C. 2945.05 "must meet five conditions" to be valid. *Lomax* at ¶ 9. "It must be (1) in writing, (2) signed by the defendant, (3) filed, (4) made part of the record, and (5) made in open court." *Id.* Furthermore, "strict compliance with the requirements of R.C. 2945.05 is necessary." *Id.* at ¶ 41.

{¶ 20} In this case, the first four conditions specified in *Lomax* were met. A written jury waiver signed by Mr. Lucas is part of the record. (June 7, 2023 Jury Waiver.) However, the requirement that the waiver be "made in open court" was not met. *Lomax* at ¶ 9. Although "a trial court does not need to engage in an extended colloquy with the defendant in order to comply with the statutory requirement that a jury waiver be made in open court," the open court requirement demands "some evidence in the record of the proceedings that the defendant acknowledged the waiver to the trial court while in the presence of counsel, if any." *Lomax* at ¶ 42. Here, the trial court stated that Mr. Lucas had "signed a jury waiver" before starting the bench trial, but the transcript contains no acknowledgment by Mr. Lucas that he waived his constitutional right to a jury trial. (June 7, 2023 Tr. at 5.) Consequently, the purported waiver was invalid, as the parties state. The first assignment of error is therefore sustained and this case will be remanded for a new trial.

**B. Second and Third Assignments of Error**

{¶ 21} Because we must remand for a new trial, the second and third assignments of error that challenge the trial court's rulings during trial are necessarily overruled as moot.

**C. Fourth Assignment of Error**

{¶ 22} In the fourth assignment of error, Mr. Lucas argues that the trial court erred when it overruled his motion for acquittal under Crim.R. 29. "Because a Crim.R. 29 motion

questions the sufficiency of the evidence, '[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence.' " *State v. Brown*, 2016-Ohio-7944, ¶ 27 (10th Dist.), quoting *State v. Hernandez*, 2009-Ohio-5128, ¶ 6 (10th Dist.). Although sustaining the first assignment of error rendered Mr. Lucas's second and third assignments of error moot, the same is not true for his assignment of error challenging the sufficiency of the state's evidence. "The United States Supreme Court has explained that 'any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense' is functionally an acquittal for purposes of double jeopardy and prevents retrial." *State v. Ramirez*, 2020-Ohio-602, ¶ 12, quoting *Evans v. Michigan*, 568 U.S. 313, 318 (2013). Because reversal due to legal insufficiency of the evidence bars retrial altogether under the Double Jeopardy clause, "[a]n assignment of error challenging the sufficiency of the evidence is potentially dispositive of a defendant's conviction and may not be rendered moot by a remand on any other assignment of error." *State v. Gideon*, 2020-Ohio-6961, ¶ 2. Thus, although remand for a new trial is necessary to remedy the invalid jury waiver in this case, we must still address Mr. Lucas's challenge to the sufficiency of the state's evidence to ensure that no double jeopardy violation results. *See, e.g., State v. Solt,* 2023-Ohio-2779, ¶ 21 (10th Dist.) (holding that the appellant's "sufficiency-of-the-evidence claim is not rendered moot by our conclusion that the trial court erred by conducting a bench trial").

**{¶ 23}** To test the evidence for legal sufficiency, a reviewing court asks "whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Dent*, 2020-Ohio-6670, ¶ 15, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4. Legal sufficiency is a question of law that asks whether the state's evidence passes a "test of adequacy." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). A conviction resulting from "legally insufficient evidence constitutes a denial of due process." *Id.*, citing *Tibbs v. Florida*, 457 U.S. 31, 41 (1982). *See also Tibbs* at 41 ("the Due Process Clause forbids any conviction based on evidence insufficient to persuade a rational factfinder of guilt beyond a reasonable doubt"). A reviewing court "will not disturb a verdict on appeal on sufficiency grounds

unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.'" *State v. Ketterer*, 2006-Ohio-5283, ¶ 94, quoting *State v. Dennis*, 1997-Ohio-372 (1997).

{¶ 24} Mr. Lucas was indicted on one count of felonious assault under R.C. 2903.11, with a firearm specification under R.C. 2941.145(A), based on the allegation that he "did knowingly cause or attempt to cause physical harm to [G.W.] by means of a deadly weapon or dangerous ordnance, to wit: firearm," as well as the allegation that he "had a firearm on or about his person or under his control while committing the offense and displayed the firearm, brandished the firearm, indicated that he possessed the firearm, or used it to facilitate the offense." (Mar. 2, 2023 Indictment.) This charge invoked the elements of felonious assault under R.C. 2903.11(A)(2), which states: "No person shall knowingly . . . [c]ause or attempt to cause physical harm to another."

{¶ 25} After viewing the evidence in a light most favorable to the state, we conclude that it was adequate to prove that Mr. Lucas knowingly caused physical harm to G.W. while using a firearm to facilitate the offense, and was therefore legally sufficient. G.W. testified that Mr. Lucas threatened him, ordered him onto the ground, and hit him both on the head and in the eye with a gun. This testimony was sufficient to show that Mr. Lucas possessed and used a firearm while committing the offense. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). By striking G.W. repeatedly with the firearm, Mr. Lucas was aware that his conduct would probably cause physical harm to G.W. Thus, G.W.'s testimony was sufficient to demonstrate that Mr. Lucas acted knowingly. Furthermore, in addition to G.W.'s testimony about his wounds and the lasting trauma to his eye, the state introduced contemporaneous evidence of physical harm in the form of photographs.

{¶ 26} Mr. Lucas argues that the video from G.W.'s phone "did not show Mr. Lucas causing [any] physical harm to" G.W., and that the video "did not show Mr. Lucas at all." (Brief of Appellant at 23-24.) However, the video was not the state's primary evidence. As Detective Gunther described it, the video corroborated G.W.'s account. Thus, any deficiencies in the video's contents are immaterial when evaluating the state's primary evidence in support of the elements of the offense.

{¶ 27} Mr. Lucas also argues that G.W. "admitted during his testimony that he had shot Mr. Lucas," but does not explain how this fact demonstrates that the state's evidence was insufficient to prove that he committed felonious assault. G.W. shot Mr. Lucas, but he did so after Mr. Lucas had completed all the actions charged as felonious assault. Thus, G.W.'s act of shooting Mr. Lucas has no bearing on the sufficiency of the state's evidence to prove felonious assault.

{¶ 28} Mr. Lucas does not present any argument against the sufficiency of the evidence that the state presented to prove the repeat violent offender specification under R.C. 2941.149(A) or the other count in the indictment, having a weapon while under disability in violation of R.C. 2923.13. Here, as well, the state's evidence was legally sufficient to prove the specification and the count. "Whenever in any case it is necessary to prove a prior conviction, a certified copy of the entry of judgment in such prior conviction together with evidence sufficient to identify the defendant named in the entry as the offender in the case at bar, is sufficient to prove such prior conviction." R.C. 2945.75(B)(1). The state introduced certified copies of three judgment entries that formed the basis for these charges, as well as the testimony of prosecutor Wharton, who identified Mr. Lucas as the defendant in those cases. (State's Exs. U, V, & W.) Because the state's evidence was legally sufficient to prove every count and specification in the indictment, the fourth assignment of error is overruled.

## II. Conclusion

{¶ 29} For the foregoing reasons, we sustain the first assignment of error, overrule the fourth assignment of error, and overrule the second and third assignments of error as moot. We reverse the judgment of the Franklin County Court of Common Pleas and remand for further proceedings consistent with this decision.

*Judgment reversed;*
*cause remanded.*

BEATTY BLUNT and EDELSTEIN, JJ., concur.

_____