[Cite as *State v. Carson*, 2025-Ohio-2409.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 24AP-339 |
| | | (C.P.C. No. 23CR-224) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Sean W. Carson, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on July 8, 2025

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, and *Darren M. Burgess*, for appellee. **Argued:** *Darren M. Burgess*.

**On brief:** *Campbell Law, LLC*, and *April F. Campbell*, for appellant. **Argued:** *April F. Campbell*.

APPEAL from the Franklin County Court of Common Pleas

JAMISON, P.J.

{¶ 1} Defendant-appellant, Sean W. Carson, appeals from convictions by a bench trial in the Franklin County Court of Common Pleas. For the following reasons, we reverse the judgment of the trial court and remand this matter for a new trial.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On January 13, 2023, a Franklin County Grand Jury indicted Carson on the following charges: Counts 1 through 3, each being rape, violations of R.C. 2907.02, felonies of the first degree. Carson pled not guilty to the charges.

{¶ 3} Prior to trial, Carson filed a motion for additional discovery, specifically a recording of the forensic interview of the alleged child victim, A.M. Ultimately, the trial

court ordered plaintiff-appellee, State of Ohio, to provide Carson's counsel with a copy of the recording of the child's forensic interview under seal.

{¶ 4} In anticipation of trial, Carson sought a subpoena for S.S., the mother of the victim, to bring A.M. with her to trial. The state filed a motion to quash that subpoena. In response, Carson filed a motion to withdraw the subpoena, which the trial court granted.

{¶ 5} The matter proceeded to trial on April 29, 2024. Carson waived his right to a jury trial and elected to be tried by a judge of the trial court.

{¶ 6} A.M. did not testify at trial.

{¶ 7} S.S. testified that she was A.M.'s mother and A.M.'s date of birth was September 11, 2016. S.S. met Carson in 2017. They began a relationship and moved in together in Spring 2019. Carson is the father of S.S.'s youngest child. Carson developed a close bond with A.M. A.M. referred to Carson as "Haus." (Apr. 29, 2024 Tr. Vol. I at 58.)

{¶ 8} In December 2022, Carson and S.S. were engaged and lived in a house on Shotgun Drive in Franklin County, Ohio. Also residing at the residence were S.S's two children from a previous relationship, including A.M., as well as the child S.S. shared with Carson. At the time, S.S. believed that the family was strong, and Carson tried to be the best father he could be for the children.

{¶ 9} S.S. testified that on the evening of December 11, 2022, all the children were sick. She put the youngest child to bed and asked Carson to give A.M. NyQuil to help her sleep. S.S. and Carson went to bed together in the basement. S.S. did not recall what Carson was wearing that night but testified that he typically wears sweatpants around the house.

{¶ 10} The next morning, Carson woke up for work, kissed S.S., told her he loved her, and left the house. A short time later S.S.'s alarm clock went off. She started her morning routine. A short time after that, A.M. awoke and asked her a question.

{¶ 11} It was at this point in S.S.'s testimony that Carson's counsel lodged an objection against S.S. testifying about what A.M. told her. The state argued that the statements were admissible as excited utterances and, in the alternative, that they were admissible under Evid.R. 807. The trial court allowed S.S. to testify as to what A.M. told her, stating "[t]here are special rules with respect to child victims and alleged sexual assault. I do find that this is appropriate testimony under those rules." (Tr. Vol. I at 69.)

{¶ 12} S.S. testified about the following exchange with A.M. that morning:

> [A.M.] approached me and she asked me, why did Haus come into my room and touch me last night. I looked at her and I asked her to reiterate what she was saying because I didn't believe what she was saying to me and she again, she repeated herself and I asked her to specify, he came into your room and he touched your vagina and she said yes.

*Id.* at 68.  Upon receiving this information, S.S. called her mother for advice.  She arranged to have the parents of the children in her in-home daycare come and pick up their children. S.S. took all three children to the emergency room and called the police.  She brought the underwear that A.M. was wearing the night before to the hospital.  Once at the hospital, A.M. participated in a forensic interview and then received a medical examination. Throughout the day on December 12, 2022, she was texting Carson about the allegations. Carson denied touching A.M. inappropriately but stated that he heard her crying in the middle of the night and got her back into bed.  S.S. testified that she did not hear A.M. crying during the night and that if A.M. were upset, she typically would come get her and Carson.

{¶ 13} Prior to cross-examining S.S., Carson's counsel renewed her objection to the admission of A.M.'s statements to her mother.  She argued that under Evid.R. 807 the child's testimony must not be reasonably obtainable by the state and the state had not made such a showing.  In overruling her objection, the trial court stated, "[t]here is a presumption that the child, given the age, is not competent to testify.  So I do find that is met." (Tr. Vol. I at 87.)

{¶ 14} On cross-examination, over the state's objection, S.S. testified that A.M. has a history of "lying" and sometimes it can be about serious things.  *Id.* at 94.  S.S. testified that A.M. has told her about certain "concerning" activities with the children that lived across the street.  *Id.* at 95.  S.S. confronted the mother of those children, and the mother stated that A.M.'s statements were not true.  The record reflects that this appears to be when Carson's counsel began to inquire about prior false sexual assault allegations made by A.M. Prior to the start of trial, the trial court heard arguments about this line of questioning but reserved its ruling until the testimony occurred.  Following S.S.'s testimony that the mother of the children across the street told S.S. that A.M.'s statements were not true, the court stopped the line of questioning and Carson's counsel moved on to a different subject.  *Id.* at 98, 100.

{¶ 15} The state's next witness was Detective Lisa McKissick of the Columbus Police Department. Prior to her direct examination, the state brought to the trial court's attention that it intended to play a recording of Detective McKissick's interview with Carson. The state redacted certain portions of the recording that discussed prior false sexual assault allegations made by A.M. The state argued that these were inadmissible under Ohio's Rape Shield Law. Counsel for Carson argued that under Evid.R. 106 the court should admit the complete recording of Carson's interview. After considering the arguments of the parties, the court allowed the state to play the redacted recording during Detective McKissick's testimony.

{¶ 16} Detective McKissick testified that she was assigned to investigate sexually based offenses involving juveniles 15 years of age or younger. She was the lead investigator in this case. On December 12, 2022, she received a call from the child advocacy center at Nationwide Children's Hospital about a child making sexual abuse allegations. As part of her investigation, she spoke with Carson about the allegations at his place of employment.

{¶ 17} During Detective McKissick's direct examination, the state sought to play the redacted version of Carson's interview. Carson's counsel again objected to the admission of the recording. The trial court paused the proceedings so that it could review the redacted portions and rule on whether any of them should be played. (Tr. Vol. I at 147-48.) Ultimately, the court ruled that each of the redacted statements related to a prior sexual assault and that they were not admissible pursuant to Ohio's Rape Shield Law. *Id*. at 155.

{¶ 18} Detective McKissick's interview with Carson lasted approximately 45 minutes. (State's Ex. D.) In the interview, Carson indicated that his relationship with S.S. had been rocky. He had a history of cheating. Carson described A.M. as a good kid, very smart, shy, and lacking in confidence. He indicated that A.M. would not lie, but that she does lie about little things. Carson told her that S.S. normally calls him with their son around 10:00 a.m. when he is at work. He realized something was wrong when he did not receive that call, so he checked the home's security cameras. He discovered that S.S.'s car was not there and began texting S.S. to see what was wrong.

{¶ 19} Carson stated that the night before, at approximately 7:00 to 7:30 p.m., he gave A.M. NyQuil. Carson admitted that he took a 10-milligram marijuana edible around 7:00 p.m. He and S.S. stayed up together cleaning the house until 10:00 p.m., at which

time they went to bed together. Between 12:00 and 1:00 a.m., he woke up and went upstairs to get a drink of water. He heard A.M. crying and entered her bedroom. At the time he was wearing pants and probably no shirt. A.M. was sobbing so he laid on the bed next to her with his legs hanging off the side. With her head in his armpit, he rubbed her back to console her. At one point during the interview, Carson stated that he probably rubbed her butt a little bit as he rubbed her back. He did not do it on purpose.

{¶ 20} Carson repeatedly denied the accusations. He stated that he just wanted A.M. to get the help she needed, and he will admit to the allegations if that gets her help. He also stated that he does not remember it happening. At the conclusion of the interview, Carson wrote an apology letter to A.M. (State's Ex. E.) In that letter he says that he is sorry, but also states, "I am not sure what is happening, I'm not sure what I did." *Id.* In the letter, Carson never admits to the allegations.

{¶ 21} The state's next witness was Mica Goulbourne, a doctor on the child assessment team at Nationwide Children's Hospital. Carson's counsel initially objected to Dr. Goulbourne's testimony as an expert witness because Carson was never provided a curriculum vitae as required by Crim.R. 16(K). The trial court overruled the objection but gave defense an opportunity to voir dire Dr. Goulbourne on her qualifications. Carson's counsel did not take that opportunity.

{¶ 22} Dr. Goulbourne testified that her role was to examine, diagnose, and treat the child. A child's statements during a forensic interview guide what she is looking for and her overall decision-making when it comes to the diagnosis. Depending on the disclosure, she might test a child differently. Her medical examination is a full head-to-toe examination of the child. Dr. Goulbourne does not necessarily expect to find injuries during the examination. In her experience, approximately 90 percent of child sexual abuse victims have normal examinations.

{¶ 23} Dr. Goulbourne conducted the medical examination of A.M. A.M.'s examination was normal. A.M.'s hymen was intact, which was not abnormal. Ultimately, she could not substantiate or unsubstantiate A.M.'s allegations of sexual abuse. During the examination, she collected a sexual assault examination kit ("SANE kit"). She collected A.M.'s DNA sample; swabbings for DNA from certain parts of A.M.'s body; and collected A.M.'s underwear from the time of the incident and the time of the examination.

Dr. Goulbourne watched A.M.'s interview. A.M.'s report indicated that she had a prior history of trauma.

{¶ 24} Caroline Vineyard, a forensic interviewer with Nationwide Children's Hospital, testified that she conducted A.M.'s forensic interview. Carson's counsel objected to her classification as an expert witness because defense was not provided with her curriculum vitae. The trial court again overruled the objection but granted the defense an opportunity to voir dire Vineyard on her qualifications. The defense did not take that opportunity.

{¶ 25} Vineyard described the forensic interview process. First, a nurse takes the child's vitals. Then the forensic interviewer meets with the caregiver to collect background information. Following the forensic interview, the team convenes, and a mental health professional provides resources to the family. The child is then seen by a doctor for a medical examination. The purpose of a forensic interview is to gather information from the child in a trauma informed way for medical diagnosis or treatment.

{¶ 26} During the actual interview, Vineyard builds rapport with the child and explains the rules. She goes over the difference between truth and lies, and the child promises to tell the truth. Vineyard then engages in a narrative event practice with the child before discussing the actual allegations. It is important to only ask open-ended questions so that answers are not suggested to the child. Following the forensic interview, the child receives a medical examination. Vineyard testified that she followed these procedures during A.M.'s forensic interview.

{¶ 27} Prior to the state playing A.M.'s forensic interview, Carson's counsel objected to its admission. The trial court overruled the defense's objection and found that the statements made during A.M.'s interview were made for the purposes of medical diagnosis or treatment and did not violate Carson's Confrontation Clause rights.

{¶ 28} A.M.'s forensic interview lasted approximately 32 minutes. (State's Ex. I.) During that interview A.M. told Vineyard that Sean Carson is her stepdad, and she calls him Haus. He lives with her, her mom, and her brothers. On Saturday nights he cuddles with her. A.M. discusses the allegations against Carson between 13:30 and 21:05 of the forensic interview recording. A.M. told Vineyard that last night her mom gave her medicine to help

her sleep. She was trying to sleep but could not because Carson kept checking on her and putting his hand in her private parts.

{¶ 29} A.M. stated that Carson came into her room three different times. She was in bed and her mom was downstairs. She remembered hearing her fan and feeling her bed move side-to-side while it was happening. Each time, Carson would come into her room, lay next to her on her bed, pull down her pants, and put his hand inside her vagina. He kept moving his hand and she kept trying to move it away. It was very painful. After the third time, she woke up and Carson asked her if she needed a tissue. She told him yes and he gave her one. After the third time, Carson stopped coming into her room. Carson only had pants on during the incident.

{¶ 30} At this point in the interview, Vineyard left the room for several minutes. When she returned, she asked A.M. more questions. This lasted from approximately 27:15 until 29:55 of the recording. A.M. stated that Carson was wearing blonde jeans at the time. She felt his hand on her skin. She stated that she takes sleep medicine every night. A.M. also stated that when she cuddles with Carson, she lays on his arm and grabs his shirt. Vineyard concluded the interview by asking A.M. what she was going to do the rest of the day. A.M. stated that she wanted to make sure it was not a dream. She was going to tell Carson and make sure he remembered.

{¶ 31} Vineyard testified that child victims of sexual abuse do not understand why people they trust would abuse them. Often children will try to explain or make sense of the abuse and protect the person who hurt them. On cross-examination Vineyard testified that it was possible that A.M. was dreaming. (Apr. 30, 2024 Tr. Vol. II at 359.)

{¶ 32} Lynndsey Simon, a forensic scientist in the DNA section of the Columbus Police Department's crime lab, was the state's final witness. Again, Carson's counsel objected to her classification as an expert witness because the defense was not provided with her curriculum vitae. The trial court maintained its prior rulings on the objection.

{¶ 33} Simon testified that she performed DNA testing on A.M.'s SANE kit. She only performed YSTR DNA testing. YSTR DNA is specific for male individuals and focuses on the Y chromosome. Females do not leave behind YSTR DNA. This type of testing allows forensic scientists to filter out any female DNA and focus on any remaining male DNA. Simon testified that she found male DNA on A.M.'s vaginal swab. However, the DNA

profile was not of sufficient quantity or quality for further interpretation or comparison. She could not determine whether Carson's DNA was on any items in A.M.'s DNA kit.

{¶ 34} Following Simon's testimony the state rested. Carson's counsel again objected to the admission of the recordings of Carson's statement and A.M.'s forensic interview. The trial court again overruled the objections. The defense made a Crim.R. 29 motion for acquittal, which was overruled by the court.

{¶ 35} The defense called three of Carson's co-workers to testify. All three witnesses testified that they did not believe that Carson was capable of doing what was alleged. All three witnesses also testified that they had no personal knowledge of the events relevant to this case.

{¶ 36} Carson testified in his own defense. On the evening of December 11, 2022, everyone in the household was sick. He gave A.M. NyQuil, and he sent her to brush her teeth. He laid out A.M.'s clothes for the next day and A.M. went to change for bed. He and S.S. stayed up cleaning until 10:00 p.m. He and S.S. went to bed together. He was wearing black sweatpants that night. Between midnight and 1:00 a.m., he woke up and went to get a glass of water from the kitchen. While doing so he heard "whimpering, sobbing." (May 1, 2024 Tr. Vol. III at 462.) Carson testified that he went into A.M.'s room and laid down next to her on the bed. A.M. was mostly asleep, and he began rubbing her back to comfort her. She stopped crying after a few seconds. Carson stayed for another minute. The family cat came into A.M.'s room so he shooed it away. Carson asked A.M. if she needed a tissue. She did not respond, but he put a tissue on her hand anyway. He left A.M.'s room, got water from the kitchen, and then went back to bed. He never went back into A.M.'s room that night.

{¶ 37} The next morning was like every other morning. He took care of the baby and left for work. He exchanged mundane texts with S.S., but did not receive the daily phone call before the baby's nap. He checked the security cameras and saw that S.S.'s car was gone. When S.S. confronted him over text messages about the allegations, he had no idea what she was talking about. Carson was contacted by Detective McKissick, and he agreed to interview with her. The interview took place in the service manager's office at Carson's work. He told Detective McKissick that A.M. does not lie because he did not want to admit that his child was a liar. Carson testified that A.M. has a history of lying and has lied about

very serious things. When he wrote the apology letter, he was not admitting to anything. Carson wanted to comfort A.M. no matter what. Carson testified that he spoke with Detective McKissick on the phone the next day for approximately one-half hour. The conversation was very confrontational, and he continued to deny the accusations.

{¶ 38} On cross-examination, Carson admitted that on the evening of December 11, 2022, he took a 10-milligram edible of marijuana. Although in his text messages to S.S. he stated that he got A.M. "back into bed," he testified that A.M. was in bed and mostly asleep when he went into her room. (State's Ex. C2.) Despite his testimony that A.M. has a history of lying about very serious things, Carson admitted that he told Detective McKissick that A.M. does not lie. Carson also admitted he did not tell Detective McKissick about certain details, such as the cat coming into A.M.'s room.

{¶ 39} After Carson's testimony, the defense rested. Carson's counsel made another Crim.R. 29 motion for acquittal, which the trial court overruled. Ultimately, the court found Carson guilty as charged in the indictment. Carson was sentenced to three prison terms of life with the possibility of parole after 15 years on each count to run concurrently. He was also ordered to register as a Tier III Sex Offender upon his release.

{¶ 40} Carson now brings this appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 41} Carson assigns the following eight assignments of error for our review:

> 1. The trial court reversibly erred in precluding evidence of A.M.'s prior false sexual allegations through multiple witnesses under hearsay rules, prejudicing Carson and denying him his right to Due Process.

> 2. The trial court reversibly erred in presuming [sic] that A.M. was presumptively not competent to testify without a hearing, violating Evid.R. 601, 807, and Carson's right of Confrontation.

> 3. The trial court reversibly erred in allowing three experts to testify in violation of Crim.R. 16(K).

> 4. The trial court reversibly erred in allowing the State to introduce A.M.'s CAC interview in violation of Carson's confrontation right.

> 5. Trial Counsel was ineffective for failing to object to the lab analyst who [sic] substitute testified for another analyst in

violation of Carson's right of Confrontation, and for failing to proffer Carson's unredacted statements.

6. Because the sole evidence in this case is that the victim, her mother, and Carson all believed that her allegation of Rape may have been a dream, the evidence against Carson was legally insufficient as a matter of law.

7. The evidence weighed manifestly against convicting Carson of these offenses.

8. Because of cumulative error, Carson was denied his right to a fair trial.

## III. STANDARD OF REVIEW

{¶ 42} "[T]he admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Conway*, 2006-Ohio-2815, ¶ 62. An abuse of discretion exists when the trial court has an unreasonable, arbitrary, or unconscionable attitude in reaching its decision. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 43} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Under the Confrontation Clause, testimonial statements of a witness are inadmissible when the witness does not appear at trial unless the witness was unavailable to testify, and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). This right applies to both federal and state prosecutions. *State v. Durdin*, 2014-Ohio-5759, ¶ 15 (10th Dist.). "We review the question of whether the trial court violated an individual's Confrontation Clause rights under a de novo standard." *Id*. Violations of a defendant's Confrontation Clause rights are not considered structural error and is subject to harmless error analysis. *State v. Phillips*, 2019-Ohio-2930, ¶ 13 (10th Dist.).

{¶ 44} A sufficiency of the evidence challenge examines "[w]hether the evidence is legally adequate to support a verdict." *State v. Kurtz*, 2018-Ohio-3942, ¶ 15 (10th Dist.). The test for sufficiency is whether the prosecution has met its burden of production at trial, and is a question of law, not fact. *State v. Boles*, 2013-Ohio-5202, ¶ 34 (12th Dist.). An appellate court's standard of review for sufficiency of the evidence " 'is whether, after

viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Smith*, 80 Ohio St.3d 89, 113 (1997), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The testimony of one witness, if believed by the trier of fact, is enough to support a conviction. *State v. Strong*, 2011-Ohio-1024, ¶ 42 (10th Dist.).

## IV.  LEGAL ANALYSIS

{¶ 45}  For ease of discussion, we address Carson's assignments of error out of order. In his second assignment of error, Carson claims the trial court reversibly erred in finding that A.M. was presumptively not competent without holding a hearing. Within that assignment of error, Carson contends that the court violated his Confrontation Clause rights by failing to ascertain A.M.'s competency prior to admitting her statements to S.S., the forensic interview, and statements made by A.M. contained in forensic reports. With regards to A.M.'s statements during the forensic interview and those contained in the forensic reports, the court admitted those statements pursuant to the medical diagnosis or treatment exception to the hearsay rule contained in Evid.R. 803(4). (Tr. Vol. II at 350, 352.) It is well-settled that a child's competency need not be determined before admitting statements pursuant to Evid.R. 803(4). *State v. D.H.*, 2007-Ohio-5970, ¶ 30 (10th Dist.), citing *State v. Muttart*, 2007-Ohio-5267. However, the issue of A.M.'s competency as it pertains to her statements made to S.S. requires further discussion.

{¶ 46}  In this case the trial court admitted A.M.'s statements to S.S. under Evid.R. 807, Ohio's hearsay exception for child statements in abuse cases. Evid.R. 807(A) permits the admission of out-of-court statements made by a child under 12 years of age describing any sexual activity performed by, with, or on the child if the following conditions are met: (1) the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness; (2) the child's testimony is not reasonably obtainable by the proponent of the statement; (3) there is independent proof of the sexual activity; and (4) at least ten days before the trial or hearing, the proponent of the statement has provided notice in writing of his or her intent to use the statement.

{¶ 47}  Notably absent from those enumerated conditions is a requirement that the trial court determine the child's competency. Despite the absence of this requirement, in

*State v. Said*, 71 Ohio St.3d 473, 477 (1994), the Supreme Court of Ohio broadly held that "a trial court must find that a declarant under the age of ten was competent at the time she made the statement in order to admit that statement under Evid.R. 807." The state correctly points out that this holding in *Said* was overruled by the Supreme Court in *State v. Silverman*, 2009-Ohio-1576. In *Silverman*, the Supreme Court was confronted with a case where the child victim passed away prior to the indictment. *Id*. at ¶ 9. As such, the trial court could not hold a competency hearing before considering the admissibility of the child's statements under Evid.R. 807. Ultimately, the *Silverman* court found that *Said's* competency requirement defeated the purpose of Evid.R. 807 and held that "a hearsay statement of a child declarant can be admitted under Evid.R. 807 without a determination of the child's competence to testify." *Id*. at ¶ 20, 34.

{¶ 48} Although *Silverman* did away with the requirement that a child's competency be determined prior to admitting testimony, pursuant to Evid.R. 807, the state's reliance on *Silverman* in this case is misplaced. In *Said*, the Supreme Court's discussion of the child's competency pertained to Evid.R. 807(A)(1)'s requirement that the "totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness." *Said* at 476-77. Here, A.M.'s competency to testify is relevant to the issue of whether her testimony is not reasonably obtainable by the state. Evid.R. 807(A)(2). In *Said*, the unavailability requirement was satisfied by the child's refusal to testify despite prompting from several individuals. *Said* at 474. Likewise, in *Silverman*, Evid.R. 807(A)(2)'s unavailability requirement was met because the child was deceased prior to the commencement of the case. *Silverman* at ¶ 9. Here, as Carson points out, the state failed to offer a reason as to why A.M.'s testimony was not reasonably obtainable. The trial court appears to have found that A.M. was not available to testify because she was *presumed* incompetent. *Compare State v. Deleon*, 2013-Ohio-2029, ¶ 28-31 (6th Dist.) (the child victim's testimony could not be obtained through any means where trial court conducted an in-camera interview of the child and found she was unable to speak or relate anything to the court). However, the state has not cited to, nor can we find, any authority that stands for the proposition that a witness is unavailable simply because he or she is presumed incompetent. As such, the court erred in finding A.M. unavailable to testify based on a presumption of incompetence without holding a competency hearing.

{¶ 49} It should also be noted that Carson contends the trial court failed to comply with the strict procedural requirements of Evid.R. 807. Carson alleges that the court failed to make findings of fact on the record as required by Evid.R. 807(C). We agree.

{¶ 50} The Supreme Court's decision in *Said* can be broken down into two parts. Although the portion regarding competency was subsequently overturned in *Silverman*, the second part of the decision in *Said* was left intact. In that portion of the decision, the Supreme Court addressed the trial court's failure to make the findings required by Evid.R. 807(C) on the record. In *Said*, the court simply found, "[t]he elements of the statute, in the court's view, have been met, and the court finds that the child is without the ability to testify, and therefore, her testimony may be substituted." *Said* at 478. The court found that this was insufficient to admit the child's out-of-court statements pursuant to Evid.R. 807. Similarly, in this case, the trial court simply found that "[t]here are special rules with respect to child victims and alleged sexual assault. I do find that this is appropriate testimony under those rules." (Tr. Vol. I at 69.) In response to Carson's counsel's arguments that the state failed to show that the child's testimony was not reasonably obtainable the court responded, "[t]here is a presumption that the child, given the age, is not competent to testify. So I do find that is met." *Id*. at 87. Not only was presuming A.M. incompetent insufficient to find her testimony not reasonably obtainable, but the court failed to make required findings as to notice, particularized guarantees of trustworthiness, and independent proof of the sexual activity. Evid.R. 807(A).

{¶ 51} Based on the foregoing, we find that the trial court erred in admitting A.M.'s statements to S.S. pursuant to Evid.R. 807. The court erroneously found A.M.'s testimony not reasonably obtainable based on a presumption that she was incompetent to testify. The court also failed to make the required findings of fact regarding Evid.R. 807(A)'s other factors. Finally, it should also be noted that the record indicates the state failed to satisfy the notice requirement in Evid.R. 807(A)(4).

{¶ 52} The state contends that even if A.M.'s statements to S.S. were inadmissible under Evid.R. 807, they were admissible as excited utterances under Evid.R. 803(2). Under that hearsay exception, out-of-court statements are admissible if they relate to a startling event or condition and were made while the declarant was under the stress of excitement caused by the event or condition. Evid.R. 803(2). Furthermore, the availability of the

witness who made such statements is immaterial. Evid.R. 803(2). At the outset, it is difficult for this court to review this argument because it is unclear whether or not the trial court considered Evid.R. 803(2). Indeed, the state argued that these statements were admissible under both Evid.R. 803(2) and 807, but the court simply found the statements admissible because "[t]here are special rules with respect to child victims and alleged sexual assault." (Tr. Vol. I at 69.)

{¶ 53} It has been held that the excited utterance exception should be liberally applied in cases involving the sexual abuse of a young child. *In re S.M.B.*, 2019-Ohio-3578, ¶ 75 (10th Dist.). This is due to " 'the age of the child, the shocking nature of the act, and the surprising nature of the assault.' " *Id.*, quoting *State v. Moore*, 2019-Ohio-1671, ¶ 38 (2d Dist.). "It is '[t]he "[i]nability to fully reflect [that] makes it likely that the statements are trustworthy." ' " *S.M.B.* at ¶ 75, quoting *State v. Wampler*, 2016-Ohio-4756, ¶ 34 (6th Dist.), quoting *State v. Taylor*, 66 Ohio St.3d 295, 304 (1993). In fact, courts have found statements to be excited utterances even if they are made long periods of time after the event that is the subject of the statements. *S.M.B.* at ¶ 75.

{¶ 54} After reviewing the record before us, we cannot conclude that A.M.'s statements to S.S. were admissible as excited utterances. Outside of the nature of the alleged event and A.M.'s age, there is no evidence from which we can determine that Evid.R. 803(2) applies to these statements. There is no evidence in the record that A.M. was upset, crying, or anxious at the time the statements were made. The statements were not made contemporaneous to the event or shortly thereafter. They were made hours later, the next morning. Although, as previously stated, the timing between the event and the statements is not dispositive, some additional evidence establishing the statements as excited utterances is necessary. For example, in *S.M.B.* at ¶ 77, the child victim became "nervous" when disclosing the sexual abuse and in the months leading up to the disclosure, she was having difficulty sleeping, had toileting accidents, cried, and was clingier. In this case, there is no such evidence.

{¶ 55} Furthermore, at least a portion of A.M.'s statements were in response to leading questions by S.S. "A hearsay statement is not . . . admissible under the excited utterance exception in Evid.R. 803(2) where testimony shows that the response was not a spontaneous excited utterance but a considered answer in response to questions." *S.M.B.*

at ¶ 76. Statements made in response to questions may be excited utterances if the questioning: "(1) is neither coercive nor leading; (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts; and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." *Id.* S.S. testified that on the morning of December 12, 2022, A.M. approached her and asked, "why did Haus come into my room and touch me last night." (Tr. Vol. I at 68.) S.S. asked A.M. to explain what she meant, and she repeated herself. *Id.* S.S. then testified that, "I asked her to specify, he came into your room and he touched your vagina and she said yes." *Id.* This follow-up question by S.S. is clearly a leading question. Although A.M.'s initial statement may have been an unsolicited, spontaneous statement, the most inculpatory information was divulged only after S.S. suggested what body part Carson touched. Because this statement was a response to a leading question, it was not admissible as an excited utterance.

{¶ 56} On the record before us, the trial court erred in admitting A.M.'s statements to S.S. because they neither qualified as excited utterances under Evid.R. 803(2), nor were they admissible under Evid.R. 807. Although we have determined that these statements were inadmissible, we must now consider whether their admission was harmless error. *Phillips*, 2019-Ohio-2930, at ¶ 13 (10th Dist.).

{¶ 57} Under Crim.R. 52(A) "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." "Error in the admission . . . of evidence in a criminal trial must be considered prejudicial unless the court can declare, beyond a reasonable doubt, that the error was harmless, and unless there is no reasonable possibility that the evidence . . . may have contributed to the accused's conviction." *State v. Jones*, 2008-Ohio-3565, ¶ 13 (10th Dist.). The issue of whether an error " 'was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *Id.*, quoting *State v. Conway*, 2006-Ohio-791, ¶ 78. In a case involving the erroneous admission of privileged spousal testimony, the Supreme Court stated that, " 'the cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction.' " *State v. Rahman*, 23 Ohio St.3d 146,

151 (1986), quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166, fn. 5 (1983). The state bears the burden of demonstrating harmless error. *State v. Perry*, 2004-Ohio-297, ¶ 15. " 'An appellate court must reverse if the government does not meet its burden.' " *Jones* at ¶ 13, quoting *State v. Auld*, 2007-Ohio-3508, ¶ 28 (5th Dist.).

**{¶ 58}** The state argues that any error in the admission of A.M.'s statements "would be harmless as additional evidence, including the presence of male DNA from A.M.'s vagina was recovered and demonstrated the defendant's guilt." (Appellee's Brief at 23.) However, this is a case where the evidence of the defendant's guilt is far from overwhelming. *See State v. Blanton*, 2009-Ohio-5334, ¶ 49 (10th Dist.). In fact, the state's case rests almost entirely on A.M.'s out-of-court statements, one of which was erroneously admitted. Although the state points to the DNA evidence in its harmless error argument, the DNA was not of sufficient quantity and/or quality to compare to Carson's DNA standard. As such, there is no way to identify the individual responsible for the DNA found or how the DNA was deposited. On this record, we cannot find that the evidence was so overwhelming to conclude that the errors were harmless beyond a reasonable doubt. *Id.* At the very least, we find that there is a reasonable probability that the admission of hearsay contributed to Carson's convictions. *Id.* While it is true that the statements A.M. made during her forensic interview were more detailed and established the elements necessary to prove the offenses of rape, the question we must answer is not whether the remaining evidence is sufficient, but whether the inadmissible evidence might have contributed to Carson's convictions.

**{¶ 59}** Having found that the trial court erred in admitting A.M.'s statements to S.S. and that error was not harmless beyond a reasonable doubt, we sustain Carson's second assignment of error.

**{¶ 60}** In his fourth assignment of error, Carson contends that the trial court reversibly erred in admitting the recording of A.M.'s forensic interview in violation of Carson's rights under the Confrontation Clause. Without authority, Carson claims that the court had to first comply with Evid.R. 807 before admitting A.M.'s forensic interview under Evid.R. 803(4). (Appellant's Brief at 28.) This is incorrect. Evid.R. 807 is not a threshold that must be met before any child's statement regarding sexual abuse is admitted. It is a hearsay exception separate and distinct from the ones outlined in Evid.R. 803(4). In this case the court admitted A.M.'s forensic interview as a statement made for purposes of

medical diagnosis or treatment. Thus, the state was not required to satisfy Evid.R. 807 prior to the interview's admission. However, while the state is correct that the case law generally supports the admission of statements made by children during forensic interviews under Evid.R. 803(4), the case law is also clear that only certain types of statements made during forensic interviews are made for the purpose of medical diagnosis or treatment. As such, Carson's Confrontation Clause rights are implicated by the court's admission of A.M.'s *entire* forensic interview.

{¶ 61} At trial, Carson's counsel objected generally to the admission of A.M.'s forensic interview. Counsel failed to point out specific statements that were not made for the purposes of medical diagnosis or treatment. Similarly, on appeal, Carson's appellate counsel objects to the admission of A.M.'s forensic interview without identifying specific statements that should have been excluded. Thus, we are limited to reviewing this issue for plain error. Crim.R. 52(B) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error is one that " 'rises to the level of challenging the legitimacy of the underlying judicial process itself.' " *State v. Santiago*, 2003-Ohio-2877, ¶ 11 (10th Dist.), quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122 (1997). "[T]he plain error rule should not be invoked unless, but for the error, the outcome of the trial would clearly have been otherwise." *Id*.

{¶ 62} In *State v. Arnold*, 2010-Ohio-2742, the Supreme Court considered the admissibility of statements made during interviews at child advocacy centers. Recognizing the dual purposes of these interviews, the court reasoned that some statements had a primarily forensic or investigative purpose and others had a primarily medical diagnosis and treatment purpose. *Arnold* at ¶ 33. Thus, some statements were non-testimonial, but others were testimonial and violated the defendant's Confrontation Clause rights. *Id*. at ¶ 33, 36. For example, the following statements were determined to primarily have a forensic or investigative purpose: (1) the defendant shut and locked the door before raping her; (2) where the victim's mother and brother were while she was in the bedroom with defendant; (3) what the defendant was wearing; (4) that the defendant removed his underwear and removed her underwear; and (5) what the defendant's genitalia looked like. *Id*. at ¶ 34. At the same time, the Supreme Court found that the child's descriptions of the acts of sexual abuse performed on her by the defendant were admissible under Evid.R.

803(4). *Id.* at ¶ 38. Thus, although the court did hold that certain statements made during forensic interviews were admissible as statements for medical diagnosis or treatment, it also explicitly held "that statements made to interviewers at child-advocacy centers that serve primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause when the declarant is unavailable for cross-examination at trial." *Id.* at ¶ 44.

{¶ 63} Following *Arnold*, courts must examine the statements made by victims to determine their admissibility. *Durdin*, 2014-Ohio-5759, at ¶ 26 (10th Dist.). In engaging in that analysis, Ohio courts of appeals have routinely held that certain contextual statements are not admissible under Evid.R. 803(4). In *Moore,* 2019-Ohio-1671, at ¶ 30 (2d Dist.), the court stated:

> We believe the trial court erred . . . insofar as it allowed the jury to hear all of A.D.'s statements to Ferguson. For example, A.D.'s statements about the physical location of the abuse and the layout of the house, the presence of anyone else, what Moore said or sounds he made while performing sex acts, and whether A.D. was asleep all appear to have been elicited and made primarily for investigatory purposes. These sorts of contextual statements were not reasonably necessary for medical diagnosis or treatment and . . . were not admissible under the Evid.R. 803(4) hearsay exception.

*See also State v. Warman*, 2017-Ohio-244, ¶ 52 (12th Dist.) (certain statements made during a forensic interview were inadmissible under Evid.R. 803(4)); *Durdin* at ¶ 27 (victim's statement that there was a gun involved and the safety was not on during the assault was not necessary for medical diagnosis or treatment).

{¶ 64} Based on the foregoing, we find that the trial court erred in admitting A.M.'s entire forensic interview without first considering whether the primary purpose of certain statements was for medical diagnosis or treatment, or whether those statements were admissible under a different Evid.R. 803 hearsay exception. Contextual statements made by A.M. were not reasonably necessary for medical diagnosis or treatment. Those statements include the following: where the alleged abuse occurred; the whereabouts of others in the house at the time of the incident; A.M. hearing her ceiling fan; what Carson allegedly said; descriptions of what Carson was allegedly wearing; A.M. feeling her bed moving side-to-side; Carson pulling down her pants; whether A.M. was asleep; and Carson

giving her a tissue at the conclusion. The primary purpose of these statements was not reasonable for medical diagnosis or treatment, but rather for forensic and investigative purposes. As such, these statements were testimonial, and their admission violated Carson's Confrontation Clause rights. *See Arnold*, 2010-Ohio-2742, at ¶ 44.

{¶ 65} Although the trial court erred in admitting these contextual statements made by A.M. during her forensic interview, we must determine whether the admission of those statements affected Carson's substantial rights. The state correctly points out that Ohio courts of appeals have frequently found that the erroneous admissions of these contextual statements did not prejudice the defendants. However, the records in these cases involve victims who testify or some other compelling evidence. For example, in *Durdin* at ¶ 29-31, the court found that the victim's statement to the nurse during the forensic interview about the defendant possessing a gun during the assault was not made for purposes of medical diagnosis or treatment. However, the error was harmless in this case. Notably, DNA evidence consistent with the defendant's DNA standard was recovered from the victim's SANE kit. *Id.* at ¶ 6. Although the court found the erroneous admission of this statement harmless as it pertained to the rape case, the court stated it was not harmless as to the firearm specification because it was the only evidence that the defendant possessed a firearm during the assault. *Id.* at ¶ 29-31. Thus, the defendant's conviction as to the firearm specification was reversed. *See also Moore* at ¶ 30 (erroneous admission of contextual statements was harmless where they were duplicative of the victim's trial testimony); *Warman* at ¶ 52 (erroneous admission of contextual statements was harmless where victim testified graphically about how the defendant assaulted her); *State v. Watts*, 2016-Ohio-5386, ¶ 8, 25 (10th Dist.) (erroneous admission of statements from forensic interviews was harmless where both victims testified at trial).

{¶ 66} Unlike in *Moore*, *Warman*, and *Watts*, the victim did not testify in this case. Thus, the inadmissible statements contained in A.M.'s interview were not duplicative of other properly admitted evidence. Although male DNA was recovered from the vaginal swabs in A.M.'s SANE kit, unlike in *Durdin*, it was of insufficient quality and/or quantity to be compared against Carson's DNA standard. While Carson made statements that some may consider incriminating, he consistently denied the allegations, including during his trial testimony. A review of the record reveals that most of the state's case relied on out-of-

court statements made by A.M. that were not subject to cross-examination. Thus, the trial court's errors involved the admission of the two statements that were vital to the state's case. Furthermore, the prejudice to Carson is evident based on a review of the state's closing argument and its responses to Carson's Crim.R. 29 motions. In those arguments, the state relied heavily on these inadmissible contextual statements that A.M. made during her forensic interview. For example, the state repeatedly referred to A.M. stating she could hear her ceiling fan during the alleged assaults and that Carson gave her a tissue at the conclusion. (Tr. Vol. III at 551, 556, 593.) The state repeatedly used these contextual statements to bolster the credibility of her allegations.

{¶ 67} Based on the foregoing, a review of the record reveals the trial court erred in admitting testimonial statements made during A.M.'s forensic interview and that error affected the outcome of Carson's trial. This error, especially when it is considered with the court's erroneous admission of A.M.'s statements to S.S., calls into question the legitimacy of the trial court proceedings. *Santiago*, 2003-Ohio-2877, at ¶ 11 (10th Dist.). It should also be noted that the court went to great lengths to review Carson's recorded interview and ensure that none of his statements ran afoul of Ohio's Rape Shield Law. However, despite the clear holding in *Arnold*, the court simply allowed all of A.M.'s forensic interview into evidence. This calls into question the fairness of Carson's trial. The court took great care to not allow inadmissible evidence that was potentially harmful to the state's case, but did not provide the same protection to Carson when it came to A.M.'s forensic interview.

{¶ 68} Based on the foregoing, we find that the trial court plainly erred in admitting testimonial statements made during A.M.'s forensic interview. Carson's fourth assignment of error is sustained in part.

{¶ 69} Although we have sustained Carson's second assignment of error and partially sustained his fourth assignment of error, we must still consider whether the evidence was sufficient to support Carson's convictions. *State v. Lucas*, 2025-Ohio-845, ¶ 22 (10th Dist.). In his sixth assignment of error, Carson alleges that his convictions were not supported by sufficient evidence.

{¶ 70} Carson was convicted of three counts of rape, violations of R.C. 2907.02(A)(1)(b) which states that "[n]o person shall engage in sexual conduct with another when . . . [t]he other person is less than thirteen years of age, whether or not the

offender knows the age of the other person." Carson's indictment in this matter further alleged that the victim was less than ten years of age. "Sexual conduct" is defined in R.C. 2907.01(A) as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body . . . into the vaginal . . . opening of another." No mens rea is contained in R.C. 2907.02(A)(1), thus strict liability applies to the sexual conduct element of raping a child under 13 years old. *State v. Ferguson*, 2008-Ohio-6677, ¶ 75 (10th Dist.).

{¶ 71} After reviewing the record and viewing the evidence and all reasonable inferences in favor of the prosecution, Carson's convictions for rape were supported by sufficient evidence. Given our resolution of Carson's second and fourth assignments of error, it should be noted that "all evidence presented in the 'state's case in chief' is used to determine sufficiency; thus, inadmissible evidence that was admitted in [sic] state's case in chief can be considered." *State v. Cayavec*, 2020-Ohio-3610, ¶ 45 (7th Dist.), citing *State v. Brewer*, 2009-Ohio-593, ¶ 1. Nevertheless, even if we did not consider the evidence we have determined to be inadmissible, the remaining evidence is sufficient to support Carson's convictions. Statements made during forensic interviews containing details about the identity of the perpetrator and the types of abuse endured by the victim are admissible pursuant to Evid.R. 803(4). *Watts*, 2016-Ohio-5386, at ¶ 26 (10th Dist.), quoting *State v. Simms*, 2012-Ohio-2321, ¶ 41 (10th Dist.). During her forensic interview, A.M. stated that Carson came into her room on three separate occasions and put his hand inside of her vagina. It was undisputed that A.M. was six years old when this occurred. This evidence is sufficient to establish that Carson engaged in sexual conduct with A.M. when she was under ten years old. Thus, viewed in a light most favorable to the state, Carson's convictions for rape were supported by sufficient evidence.

{¶ 72} Based on the foregoing, Carson's sixth assignment of error is overruled.

## V. CONCLUSION

{¶ 73} In light of our resolution of Carson's second, fourth, and sixth assignments of error, Carson's remaining assignments of error are rendered moot. *State v. Solt*, 2023-Ohio-2779, ¶ 20 (10th Dist.). Having sustained Carson's second assignment of error, sustained in part his fourth assignment of error, and overruled his sixth assignment of

error, the judgment of the Franklin County Court of Common Pleas is reversed, and this matter is remanded to that court for a new trial consistent with this decision.

*Judgment reversed*;
*cause remanded.*

BEATTY BLUNT and EDELSTEIN, JJ., concur.

————————————